419 S.E.2d 457

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Joseph Edward BUNDA and Ricky Clinton DeVault, Defendants Below, Appellants.**

**No. 20462.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 22, 1992.

Decided May 29, 1992.

John Angotti, Morgantown, for appellant, Joseph Edward Bunda.

Samuel S. Pangburn, Washington, Pa., for appellant, Ricky Clinton DeVault.

Mario Palumbo, Michael J. Basile, Charleston, for appellee.

**PER CURIAM:**

The defendants, Joseph E. Bunda and Ricky C. DeVault, were both convicted on six counts of arson by jury verdict in the Circuit Court of Monongalia County. Upon appeal, the defendants submit that the trial court committed reversible error when it (1) admitted evidence of other crimes and prior convictions of the defendants, and (2) permitted the testimony of two Pennsylvania state troopers as to oral confessions made by the defendants. Upon a careful review of the record and the applicable law, we find that the trial court did not err and therefore we affirm the jury verdicts.

This case arises from a series of six arsons which occurred on the evening of January 18, 1987. Five summer homes in close proximity along Cheat Lake in Monongalia County suffered almost total destruction. Signs of forced entry to a sixth house were obvious and a fire was set, but it did not spread beyond a small area. A witness to the fires testified that a person was running from house to house carrying an object that was aflame as the homes caught fire.[1]

Prior to the Cheat Lake arsons, police and fire investigators from Monongalia County and Preston County, along with their counterparts in nearby Pennsylvania and Maryland counties, conducted a meeting to discuss a rash of burglaries and arsons to summer homes located near lakes in their respective jurisdictions. The various investigatory agencies agreed to share information and pool resources because, although the crimes occurred in different jurisdictions, they were of such a similar nature to warrant the suspicion that they were perpetrated by the same individual or individuals.

On March 3, 1987, several burglary-arsons occurred to summer lake homes in Fayette and Somerset counties, Pennsylvania. Two Pennsylvania state troopers inde-

---

1. The witness was separated from the burning homes by the lake and viewed the fires from a distance of 400 yards. He could not identify the person carrying the torch.

pendently received information[2] that a car matching the description and registration number of a car belonging to defendant Bunda was seen in the area and at the time of the March 3, 1987 crimes. On the morning of March 10, 1987, the two officers, Troopers Charles Goldstrum and Edward Hostetler, visited defendant Bunda at his residence. They explained to Mr. Bunda the purpose of their visit and requested to see his vehicle. Mr. Bunda agreed. After allowing the officers to view his vehicle, Mr. Bunda admitted his involvement in the March 3, 1987 crimes and other, earlier arson-burglaries to summer lake houses. After notifying Mr. Bunda of his Miranda rights, the officers asked him if he was willing to waive those rights and explain in more detail his involvement. Mr. Bunda agreed. Bunda signed a standard "waiver of rights" form,[3] and agreed to accompany the officers on a drive to point out the various locations of his arson-burglary crimes.

Defendant Bunda thereafter informed the officers that he had not acted alone in the crimes and that defendant DeVault participated as well. In response to questioning by Trooper Goldstrum, Bunda also admitted that he and DeVault had been responsible for the Cheat Lake fires of January 18, 1987, as well as many similar crimes in Fayette and Somerset counties of Pennsylvania.

After spending several hours driving to the scenes of various crimes in Pennsylvania, the officers and Mr. Bunda visited Mr. DeVault at his place of employment. After the officers explained the purpose of their visit, and Mr. Bunda informed Mr. DeVault of what Bunda had already admitted to them, DeVault also confessed his involvement in the burglary-arsons.

The officers explained the "Miranda" rights to Mr. DeVault and asked him if he was willing to waive them. DeVault agreed to waive his rights and signed a standard "waiver of rights" form.[4] He also agreed to accompany the officers and Bunda as they continued to locate various crime sites. During the course of their

---

2. The two troopers were stationed in different counties, but contacted each other after receiving the information separately.

3. The form signed by Mr. Bunda was entitled "Pennsylvania State Police—Your Rights." The form was read to Mr. Bunda by Trooper Goldstrum and witnessed by Trooper Hostetler. The form states:

My name is Charles E. Goldstrom of the Pennsylvania State Police. I wish to advise you that you have an absolute right to remain silent; that anything you say can and will be used against you in a court of law; that you have a right to talk to an attorney *before* and have an attorney present with you *during* questioning; that if you cannot afford to hire an attorney, one will be appointed to represent you without charge before any questioning, if you so desire. If you do decide to answer any questions, you may stop any time you wish.

WAIVER

I fully understand the statement advising me of my rights and I am willing to answer questions. I do not want an attorney and I understand that I may refuse to answer questions anytime during the questioning. No promises have been made to me, nor have any threats been made against me.

Mr. Bunda signed the form.

4. The form signed by Mr. DeVault differed slightly from that signed by Mr. Bunda. The form was entitled "Pennsylvania State Police—Rights Warning and Waiver." The form was read to Mr. DeVault by Trooper Hostetler and witnessed by Trooper Goldstrum. The form states:

My name is Tpr. Edward F. Hostetler of the Pennsylvania State Police. You have an absolute right to remain silent and anything you say can and will be used against you in a court of law. You also have the right to talk to an attorney before and have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before any questioning, if you so desire. If you do decide to answer questions, you may stop any time you wish and you cannot be forced to continue.

WAIVER

I fully understand the statement warning me of my rights and I am willing to answer questions. I do not want an attorney and I understand that I may stop answering questions anytime during the questioning. No promises have been made to me, nor have I been threatened in any manner.

Mr. DeVault signed the form.

Appellants assert that the slight difference in the wording of the forms somehow shows that the signed waivers are innately invalid. We find no merit in this assertion.

search, DeVault also admitted his involvement in the six arsons at Cheat Lake.[5]

In response to questioning by the officers, both Bunda and DeVault recalled the exact number of fires set at Cheat Lake (specifically, DeVault admitted setting two of the six fires and Bunda admitted setting four). They recalled that one of the six fires failed to spread. They further recalled that the incidents occurred on a dead-end road, and both feared they would be identified leaving the scene because of the lone escape route. The details provided by the defendants matched the conditions of the crime scene. Neither officer had been aware of the details of the Cheat Lake arsons prior to the defendants' confessions.

After observing the crime sites in Pennsylvania, the defendants gave tape recorded confessions to the officers. The tape recorded confessions made no mention of the Cheat Lake fires. While recording the confessions, the officers did not question the defendants as to the Cheat Lake fires because they were unfamiliar with the details of the Cheat Lake crimes and wanted the investigating officer from West Virginia to perform the questioning. However, prior to the arrival of the investigating officer from West Virginia, the defendants chose to exercise their right to remain silent. They thereafter refused to discuss the Cheat Lake fires.

The defendants were arrested in Pennsylvania. In Fayette County, Bunda chose to plead guilty to eighteen counts of burglary and DeVault plead guilty to fifteen counts of burglary. Both defendants plead guilty to three counts of burglary, four counts of arson and four counts of criminal trespass in Somerset county.[6]

Appellants were also indicted on six counts of first degree arson in Monongalia County, West Virginia. At trial, the Circuit Court of Monongalia County permitted testimony by the Pennsylvania state troopers concerning the defendants' confessions and the guilty pleas of the defendants to the Pennsylvania crimes. The defendants objected to the admission of all such testimony, but their objections were overruled. Both defendants were found guilty on all six counts of first degree arson by jury verdict on July 24, 1990.

By order entered January 2, 1991, the defendants were each sentenced to imprisonment for two to twenty years on Count I to run consecutive with the sentences imposed by the Commonwealth of Pennsylvania. Defendants were sentenced to imprisonment for two to twenty years on Count II to run consecutive to Count I. On Counts II through VI, defendants were sentenced to imprisonment for two to twenty years on each count, to run concurrently with Count II. This appeal followed.

■ The defendants' first contention is that the trial court committed reversible error by admitting evidence of other crimes and prior convictions pursuant to Rules 402, 403 and 404(b) of the *W.Va.R.Evid.*[7]

---

5. The officers and the defendants did not drive to the scene of the Cheat Lake crimes. The admission to the crimes by the defendants was in response to questioning by the officers.

6. It should be noted that in Pennsylvania burglary is a felony one and arson is a felony two. The defendants were required to plea to the more serious charge of burglary. In most of the incidents where the defendants pled guilty to burglary, the burglarized home was also burned.

7. Rule 402 of the *W.Va.R.Evid.* states:

> **Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of West Virginia, these rules, or other

rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible.

Rule 403 states:

> **Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Rule 404(b) states:

> (b) *Other crimes, Wrongs or Acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible

Counsel for the defendants argue that the trial court ruled that the evidence of other crimes was "improper" but nonetheless permitted the evidence and instructed the jury with the language of Rule 404(b).[8] A review of the record shows that the trial court actually ruled that, "I'm going to allow the State to introduce evidence of other crimes and other bad acts, or crimes under 404(b)." Furthermore, at defense counsel's request, the jury was instructed as to the purposes for which the other crimes evidence under Rule 404(b) was offered prior to presentation of that testimony. The trial court instructed the jury that:

Evidence of other offenses that the defendants may have been involved with should not be considered as proof that they have committed or are guilty of the offenses charged in Monongalia County. That is the important thing that you must understand. They are admissible for the limited purpose of showing motive, plan, or scheme or design and potentially also for identity, but not strictly per se to show that because these defendants may have been if the evidence shows convicted or committed some offenses in the State of Pennsylvania that therefore if they are, this is proof of the charges against them in Monongalia County. You should not consider it for any other purpose than what I have instructed you.

 In *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986), we noted the general rule regarding the admission of evidence of collateral crimes. In syllabus point 1 we stated:

'Subject to exceptions, it is a well-established common-law rule that in a criminal prosecution, proof which shows or tends to show that the accused is guilty of the commission of other crimes and

offenses at other times, even though they are of the same nature as the one charged, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged, unless such other offenses are an element of or are legally connected with the offense for which the accused is on trial.' Syllabus Point 11, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

In syllabus point 2 of *Dolin*, we noted the exceptions to the general rule:

'The exceptions permitting evidence of collateral crimes and charges to be admissible against an accused are recognized as follows: the evidence is admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial.' Syllabus Point 12, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

However, we went on to note "that there are so many exceptions to the rule [barring collateral crimes] that it is difficult to determine which is more extensive—the rule or its acknowledged exceptions."[9] 176 W.Va. at 693, 347 S.E.2d at 213.

It is abundantly clear from the record that the trial court admitted the evidence of collateral crimes "for the limited purpose of showing motive, plan, or scheme or design and potentially also for identity." Such a purpose was proper under Rule 404(b).

Defendants alternatively argue that the other crimes evidence, even if offered for a proper purpose and found relevant, should have been excluded under Rule 403 be-

---

for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**8.** Defense counsel seized upon the trial court's statement, midway through the trial, that "the evidence is being offered for improper purposes under Rule 404(b)...." However, this was

clearly a misstatement by the trial court when the record is viewed as a whole. The trial court ruled such evidence admissible earlier in the trial and numerous discussions on the record refer to the admissibility of such evidence, and the proper purposes therefore.

**9.** Quoting from *State v. Thomas*, 157 W.Va. 640, 654–55, 203 S.E.2d 445, 455 (1974).

cause the prejudice to the defendants outweighed the probative value of the evidence. The reason for the prejudice is asserted as being the fact that the Pennsylvania pleas included only four arsons, while six arsons were charged in West Virginia. The trial court, however, duly considered that most of the Pennsylvania pleas were to burglaries. Because there was clear evidence of burglary as a motive for the arsons in West Virginia, and the fact that several of the Pennsylvania crimes to which the defendants pled guilty were burglaries which included arsons (although only burglaries were charged), the trial court found evidence of a common scheme and plan. This, combined with the evidence that all the crimes occurred to summer houses near lakes which were not used year round provided further evidence of a common plan and scheme and identity.

■ In syllabus point 4 of *Dolin,* we stated:

'In the proper exercise of discretion, the trial court may exclude evidence of collateral crimes and charges if the court finds that its probative value is outweighed by the risk that its admission will create substantial danger of undue prejudice or confuse the issues or mislead the jury or unfairly surprise a party who has not had reasonable ground to anticipate that such evidence would be offered.' Syllabus Point 15, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974).

In this case the trial court did not find that the probative value of the evidence of the collateral crimes was outweighed by the danger of undue prejudice, and we agree. The collateral crimes were of such a similar nature, and so related in time, to establish motive, intent, common scheme and plan, and identity. The trial court was correct in finding that the probative value outweighed the prejudice to these defendants.

As their second assignment of error, the defendants contend that the trial court committed reversible error in permitting the two Pennsylvania state troopers to testify concerning the oral confessions of the defendants. Counsel for defendants contend the confessions were given involuntarily and by force, threat and coercion.

The trial court held a suppression hearing on February 21, 1990 to determine the validity of the confessions. At that time, Trooper Goldstrum testified that both he and Trooper Hostetler had independently received information placing defendant Bunda's vehicle near the scene of a March 3, 1987 arson in Pennsylvania at the time of that arson. It was the reception of this information that gave them probable cause to question defendant Bunda on March 10, 1987.[10]

■ In *State v. Woods,* 169 W.Va. 767, 289 S.E.2d 500 (1982), we noted the burden placed upon the State when it desires to introduce the confession of a defendant in a criminal trial. In syllabus point 1, we stated:

'The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case.' Syllabus Point 5, *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975).

In syllabus point 2 of *Woods,* we noted the wide discretion granted a trial court when it determines the voluntariness of a confession: " 'The trial court has wide discretion as to the admission of confessions and ordinarily this discretion will not be disturbed on review.' Syllabus Point 2, *State v. Lamp,* 163 W.Va. 93, 254 S.E.2d 697 (1979)." Furthermore, in syllabus point 1 of *State v. Nicholson,* 174 W.Va. 573, 328 S.E.2d 180 (1985), we stated: " 'A trial court's decision regarding the voluntari-

---

**10.** We find no merit in defense counsel's contention that the troopers did not receive the information regarding defendant Bunda's registration until after March 10, 1987. The record, when viewed as a whole, clearly shows that the troopers received the information prior to their visit with defendant Bunda, thus giving them probable cause to question him regarding the various crimes.

ness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence.' Syl. Pt. 3, *State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978)."

In the instant case, there is no evidence of any threats, coercion or force in the record. There is simply no evidence to support the contention of defendants that their confessions were involuntary. In fact, the defendants did not simply confess to the crimes, but recounted with geographical specificity details of the West Virginia crimes of which the Pennsylvania state troopers were unaware. By far more than a preponderance of the evidence, the confessions of the defendants were voluntary.

In light of the foregoing, the jury verdict and sentencing order of the Circuit Court of Monongalia County are affirmed.

Affirmed.